# REYNOLDSVILLE CASKET CO. ET AL. *v.* HYDE

No. 94–3.   Argued February 27, 1995—Decided May 15, 1995

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 759. KENNEDY, J., filed an opinion concurring in the judgment, in which O'CONNOR, J., joined, *post*, p. 761.

*William E. Riedel* argued the cause and filed briefs for petitioners.

*Timothy B. Dyk* argued the cause for respondent. With him on the brief was *David J. Eardley.**

JUSTICE BREYER delivered the opinion of the Court.

In *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.,* 486 U. S. 888 (1988), this Court held unconstitutional (as impermissibly burdening interstate commerce) an Ohio "tolling" provision that, in effect, gave Ohio tort plaintiffs unlimited time to sue out-of-state (but not in-state) defendants. Subsequently, in the case before us, the Supreme Court of

---

*Irene C. Keyse-Walker* filed a brief for the Dalkon Shield Claimants Trust as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Ohio by *Lee Fisher,* Attorney General, *Richard A. Cordray,* State Solicitor, and *Simon B. Karas;* and for Brown & Szaller Co., L. P. A., et al. by *James F. Szaller, Robert A. Marcis, Larry S. Stewart,* and *Jeffrey R. White.*

Ohio held that, despite *Bendix*, Ohio's tolling law continues to apply to tort claims that accrued before that decision. This holding, in our view, violates the Constitution's Supremacy Clause. We therefore reverse the Ohio Supreme Court's judgment.

The accident that led to this case, a collision between a car and a truck, occurred in Ashtabula County, Ohio, on March 5, 1984. More than three years later, on August 11, 1987, Carol Hyde (respondent here) sued the truck's driver, John Blosh, and its owner, Reynoldsville Casket Company (petitioners). All parties concede that, had Blosh and Reynoldsville made their home in Ohio, Ohio law would have given Hyde only two years to bring her lawsuit. See Ohio Rev. Code Ann. § 2305.10 (1991). But, because petitioners were from Pennsylvania, a special provision of Ohio law tolled the running of the statute of limitations, making the lawsuit timely. See § 2305.15(A) (tolling the statute of limitations while a person against whom "a cause of action accrues" is "out of" or "departs from" the State).

Ten months after Hyde brought her suit, this Court, in *Bendix, supra,* held that the tolling provision on which she relied, § 2305.15(A), places an unconstitutional burden upon interstate commerce. Soon thereafter, the Ashtabula County Court of Common Pleas, finding this case indistinguishable from *Bendix,* held that the tolling provision could not constitutionally be applied to the case, and dismissed the lawsuit as untimely. The intermediate appellate state court affirmed the dismissal. However, the Ohio Supreme Court reinstated the suit. Its syllabus, which under Ohio law sets forth the authoritative basis for its decision, see Ohio Supreme Court Rules for the Reporting of Opinions Rule 1(B) (1994–1995); *Akers* v. *Serv-A-Portion, Inc.,* 31 Ohio St. 3d 78, 79, n. 1, 508 N. E. 2d 964, 965, n. 1 (1987), simply says, *"Bendix Autolite Corp. v. Midwesco Enterprises, Inc. . . .* may not be retroactively applied to bar claims in state courts which had accrued prior to the announcement of that deci-

sion. (Section 16, Article I, Ohio Constitution, applied.)" 68 Ohio St. 3d 240, 240–241, 626 N. E. 2d 75 (1994). We granted certiorari to decide whether the Federal Constitution permits Ohio to continue to apply its tolling statute to pre-*Bendix* torts. And, as we have said, we conclude that it does not.

Hyde acknowledges that this Court, in *Harper* v. *Virginia Dept. of Taxation,* 509 U. S. 86, 97 (1993), held that, when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as "retroactive," applying it, for example, to all pending cases, whether or not those cases involve predecision events. She thereby concedes that, the Ohio Supreme Court's syllabus to the contrary notwithstanding, *Bendix* applies to her case. And, she says, as "a result of *Harper,* there is no question that *Bendix* retroactively invalidated" the tolling provision that makes her suit timely. Brief for Respondent 8.

Although one might think that is the end of the matter, Hyde ingeniously argues that it is not. She asks us to look at what the Ohio Supreme Court has done, not through the lens of "retroactivity," but through that of "remedy." States, she says, have a degree of legal leeway in fashioning remedies for constitutional ills. She points to *Chevron Oil Co.* v. *Huson,* 404 U. S. 97 (1971), in which this Court applied *prospectively only* its ruling that a 1-year statute of limitations governed certain tort cases—primarily because that ruling had "effectively overruled a long line of decisions" applying a more generous limitations principle (that of laches), upon which plaintiffs had reasonably relied. *Id.,* at 107. She concedes that *Harper* overruled *Chevron Oil* insofar as the case (selectively) permitted the prospective-only application of a new rule of law. But, she notes the possibility of recharacterizing *Chevron Oil* as a case in which the Court simply took reliance interests into account in tailoring an appropriate remedy for a violation of federal law. See

*Harper, supra,* at 133–134 (O'CONNOR, J., dissenting); *American Trucking Assns., Inc.* v. *Smith,* 496 U. S. 167, 218–225 (1990) (STEVENS, J., dissenting). And she quotes Justice Harlan, who, before *Chevron Oil,* pointed out that "equitable considerations" such as "'reliance'" might prove relevant to "relief." *United States* v. *Estate of Donnelly,* 397 U. S. 286, 296–297 (1970) (concurring opinion).

Thus, Hyde asks, why not look at what the Ohio Supreme Court has done in this case as if it were simply an effort to fashion a remedy that takes into consideration her reliance on pre-*Bendix* law? Here, the remedy would actually consist of providing *no* remedy for the constitutional violation or, to put the matter more precisely, of continuing to toll the 2-year statute of limitations in pre-*Bendix* cases, such as hers, as a state law "equitable" device for reasons of reliance and fairness. She claims that use of this device violates no federal constitutional provision (such as the Due Process Clause) and is therefore permissible.

One serious problem with Hyde's argument lies in the Ohio Supreme Court's legal description of why, in fact, it refused to dismiss Hyde's case. As we have pointed out, the Ohio Supreme Court's syllabus (the legally authoritative statement of its holding) speaks, not about remedy, but about retroactivity. Regardless, we do not see how, in the circumstances before us, the Ohio Supreme Court could change a legal outcome that federal law, applicable under the Supremacy Clause, would otherwise dictate simply by calling its refusal to apply that federal law an effort to create a remedy. The Ohio Supreme Court's justification for refusing to dismiss Hyde's suit is that she, and others like her, may have reasonably relied upon pre-*Bendix* law—a reliance of the same kind and degree as that involved in *Chevron Oil.* But, this type of justification—often present when prior law is overruled—is the very sort that this Court, in *Harper,* found insufficient to deny retroactive application of a new legal rule (that had been applied in the case that first an-

nounced it). If *Harper* has anything more than symbolic significance, how could virtually identical reliance, without more, prove sufficient to permit a virtually identical denial simply because it is characterized as a denial based on "remedy" rather than "nonretroactivity"?

Hyde tries to answer this question by pointing to other cases in which, she claims, this Court has allowed state courts effectively to avoid retroactive application of federal law by denying a particular remedy for violation of that law or by refusing to provide any remedy at all. She argues that these cases are similar enough to her own to permit a "remedial" exception to the retroactive application of *Bendix*. We have examined the cases to which Hyde looks for support, and conclude that they all involve very different circumstances.

First, Hyde points to a statement in the opinion announcing the Court's judgment in *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529 (1991), that once "a rule is found to apply 'backward,' there may then be a further issue of remedies, *i. e.,* whether the party prevailing under a new rule should obtain the same relief that would have been awarded if the rule had been an old one." *Id.,* at 535 (opinion of SOUTER, J.); *ibid.* ("Subject to possible constitutional thresholds, . . . the remedial inquiry is one governed by state law, at least where the case originates in state court"); *American Trucking Assns., Inc.* v. *Smith,* 496 U. S., at 178 (opinion of O'CONNOR, J.) (speaking of the need to "distinguish the question of retroactivity . . . from the distinct remedial question"); *id.,* at 210 (STEVENS, J., dissenting) (distinguishing "between retroactivity as a choice-of-law rule and retroactivity as a remedial principle"). This language, however, read both literally and in context, makes clear that the ordinary application of a new rule of law "backwards," say, to pending cases, may *or may not,* involve a further matter of remedies. Whether it does so, and, if so, what kind of remedy the state court may fashion, depend—like almost all legal issues—

upon the kind of case, matter, and circumstances involved. Not all cases concerning retroactivity and remedies are of the same sort.

Second, Hyde points to tax cases in which the Court applied retroactively new rules holding certain state tax laws unconstitutional, but nonetheless permitted the state courts a degree of leeway in designing a remedy, including a remedy that would deny state taxpayers, with pending refund cases, the refund that they sought. See *Harper* v. *Virginia Dept. of Taxation*, 509 U. S. 86 (1993); *Beam, supra*. If state courts may at the same time apply new law (invalidating tax statutes) and withhold relief (tax refunds) from tax plaintiffs, asks Hyde, why can they not at the same time apply new law (invalidating tolling statutes) and withhold relief (dismissal) from tort defendants?

The answer to this question lies in the special circumstances of the tax cases. The Court has suggested that some of them involve a particular kind of constitutional violation—a kind that the State could cure without repaying back taxes. See *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18, 40–41 (1990). Where the violation depends, in critical part, upon differential treatment of two similar classes of individuals, then one might cure the problem either by similarly burdening, or by similarly unburdening, both groups. Where the violation stemmed from, say, taxing the retirement funds of one group (retired Federal Government employees) but not those of another (retired state government employees), see *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989), then the State might cure the problem either (1) by taxing both (imposing, say, back taxes on the previously advantaged group, to the extent constitutionally permissible), or (2) by taxing neither (and refunding back taxes). Cf. *McKesson Corp., supra*, at 40–41, and n. 23. And, if the State chooses the first, then the taxpayers need receive no refund. But, that result flows not from some general "reme-

dial" exception to "retroactivity" law, but simply from the fact that the state law that the taxpayer had attacked now satisfies the Constitution.

One can imagine a roughly comparable situation in the statute of limitations context. Suppose that Ohio violated the Constitution by treating two similar classes of tort defendants differently, say, by applying a 2-year statute of limitations to the first (in-state defendants) but a 4-year statute to the second (out-of-state defendants). Ohio might have cured this (imaginary) constitutional problem either (1) by applying a 4-year statute to both groups, or (2) by applying a 2-year statute to both groups. Had it chosen the first of these remedies, then Hyde's case could continue because the 4-year statute would no longer violate the Federal Constitution. This imaginary case, however, is not the case at hand, for the Ohio Supreme Court's "remedy" here (allowing Hyde to proceed) does not cure the tolling statute's problem of unconstitutionality. And, her tort claim critically depends upon Ohio tolling law that continues to violate the Commerce Clause.

Other tax examples present different, remedial problems. Suppose a State collects taxes under a taxing statute that this Court later holds unconstitutional. Taxpayers then sue for a refund of the unconstitutionally collected taxes. Retroactive application of the Court's holding would seem to entitle the taxpayers to a refund of taxes. But what if a preexisting, separate, independent rule of state law, having nothing to do with retroactivity—a rule containing certain procedural requirements for any refund suit—nonetheless barred the taxpayers' refund suit? See *McKesson Corp., supra,* at 45; *Reich* v. *Collins,* 513 U. S. 106, 111 (1994). Depending upon whether or not this independent rule satisfied other provisions of the Constitution, it could independently bar the taxpayers' refund claim. See *McKesson Corp., supra,* at 45.

This tax scenario simply reflects the legal commonplace that, when two different rules of law each independently bar recovery, then a decision, the retroactive application of which invalidates one rule, will make no difference to the result. The other, constitutionally adequate rule remains in place. Hyde cannot bring her case within the protection of this principle, for the Ohio Supreme Court did not rest its holding upon a pre-existing, separate rule of state law (having nothing to do with retroactivity) that independently permitted her to proceed. Rather, the maintenance of her action critically depends upon the continued application of the Ohio statute's "tolling" principle—a principle that this Court has held unconstitutional.

Third, Hyde points to the law of qualified immunity, which, she says, imposes a "remedial" limitation upon the "retroactive" application of a new rule to pending cases. To understand her argument, consider the following scenario: (1) Smith sues a police officer claiming injury because of an unconstitutional arrest; (2) the police officer asserts that the arrest was constitutional; (3) this Court then holds, in a different case, that an identical arrest is *not* constitutional; (4) the holding of this different case applies retroactively to Smith's case; but (5) the police officer still wins on grounds of qualified immunity because the new rule of law was not "clearly established" at the time of the arrest. See generally *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). In one sense, Smith lost for a reason similar to the tax plaintiffs mentioned above, namely, that a previously existing, separate, constitutional legal ground (that of the law not being "clearly established") bars her claim. We acknowledge, however, that this separate legal ground does reflect certain remedial considerations. In particular, it permits government officials to rely upon old law. But, it does so lest threat of liability " 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching

discharge of their duties.'" *Id.*, at 814 (quoting *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949)). And, it reflects the concern that "society as a whole," without that immunity, would have to bear "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." 457 U. S., at 814. These very facts—that a set of special federal policy considerations have led to the creation of a well-established, independent rule of law—distinguish the qualified immunity cases from the case before us, where a concern about reliance alone has led the Ohio court to create what amounts to an ad hoc exemption from retroactivity.

Finally, Hyde points to the line of cases starting with *Teague* v. *Lane*, 489 U. S. 288 (1989), in which, she says, this Court has held that a habeas corpus petitioner cannot obtain a habeas corpus remedy where doing so would require the habeas court to apply retroactively a new rule of criminal law. The *Teague* doctrine, however, does not involve a special "remedial" limitation on the principle of "retroactivity" as much as it reflects a limitation inherent in the principle itself. New legal principles, even when applied retroactively, do not apply to cases already closed. Cf. *United States* v. *Estate of Donnelly*, 397 U. S., at 296 (Harlan, J., concurring) (at some point, "the rights of the parties should be considered frozen" and a "conviction . . . final"). And, much as the qualified immunity doctrine embodies special federal policy concerns related to the imposition of damages liability upon persons holding public office, the *Teague* doctrine embodies certain special concerns—related to collateral review of state criminal convictions—that affect which cases are closed, for which retroactivity-related purposes, and under what circumstances. No such special finality-related concerns are present here.

The upshot is that Hyde shows, through her examples, the unsurprising fact that, as courts apply "retroactively" a new rule of law to pending cases, they will find instances where

that new rule, for well-established legal reasons, does not determine the outcome of the case. Thus, a court may find (1) an alternative way of curing the constitutional violation, or (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) as in the law of qualified immunity, a well-established general legal rule that trumps the new rule of law, which general rule reflects *both* reliance interests and other significant policy justifications, or (4) a principle of law, such as that of "finality" present in the *Teague* context, that limits the principle of retroactivity itself. But, this case involves no such instance; nor does it involve any other special circumstance that might somehow justify the result Hyde seeks. Rather, Hyde offers no more than simple reliance (of the sort at issue in *Chevron Oil*) as a basis for creating an exception to *Harper*'s rule of retroactivity—in other words, she claims that, for no special reason, *Harper* does not apply. We are back where we started. Hyde's necessary concession, that *Harper* governs this case, means that she cannot prevail.

The judgment of the Supreme Court of Ohio is

*Reversed.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court, which assumes that the Ohio Supreme Court denied petitioner a "remedy" for the unconstitutionality of the tolling statute, and refutes the notion that "remedial discretion" would allow that unconstitutionality to be given no effect. That was the theory on which this case was presented and argued, and it is properly decided on the same basis.

I write separately, however, to record my doubt that the case in fact presents any issue of remedies or of remedial discretion at all. A court does not—in the nature of things it *can* not—give a "remedy" for an unconstitutional statute, since an unconstitutional statute is not in itself a cognizable

"wrong." (If it were, every citizen would have standing to challenge every law.) In fact, what a court does with regard to an unconstitutional law is simply to *ignore* it. It decides the case *"disregarding the [unconstitutional] law," Marbury* v. *Madison,* 1 Cranch 137, 178 (1803) (emphasis added), because a law repugnant to the Constitution "is void, and is as no law," *Ex parte Siebold,* 100 U. S. 371, 376 (1880). Thus, if a plaintiff seeks the return of money taken by the government in reliance on an unconstitutional tax law, the court ignores the tax law, finds the taking of the property therefore wrongful, and provides a remedy. Or if a plaintiff seeks to enjoin acts, harmful to him, about to be taken by a government officer under an unconstitutional regulatory statute, "the court enjoins, in effect, not the execution of the statute, but the acts of the official, *the statute notwithstanding." Massachusetts* v. *Mellon,* 262 U. S. 447, 488–489 (1923) (emphasis added). In such cases, it makes sense to speak of "remedial discretion."

In the present case, however, ignoring the unconstitutional statute (which the Ohio courts were bound to do) did not result in the conclusion that some remedy must be provided (over which the courts might have some discretion). Rather, it resulted in the conclusion that the remedy which the *plaintiff* sought could *not* be provided. Respondent's suit was concededly untimely under the applicable state statute of limitations, Ohio Rev. Code Ann. § 2305.10 (1991). See *ante,* at 751. When petitioners moved to dismiss the suit, respondent replied that the suit *was* timely by virtue of the tolling provision, § 2305.15(A). The tolling provision, however, was unconstitutional, see *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.,* 486 U. S. 888 (1988), and since it was unconstitutional it "was . . . as inoperative as if it had never been passed," *Chicago, I. & L. R. Co.* v. *Hackett,* 228 U. S. 559, 566 (1913).

In contemplation of the law, then, all that the trial court had before it was a concededly untimely suit, and (absent

some valid Ohio law other than the tolling statute) it had no alternative but to dismiss. The Court's opinion gives reasons why the Ohio law applied by the Ohio Supreme Court in this case is in its substance invalid. I add that even the rubric under which that law was announced is invalid: It has nothing to do with remedial discretion.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

We do not read today's opinion to surrender in advance our authority to decide that in some exceptional cases, courts may shape relief in light of disruption of important reliance interests or the unfairness caused by unexpected judicial decisions. We cannot foresee the myriad circumstances in which the question might arise. In two classes of cases, courts already take account of these considerations: cases involving qualified immunity, which protects public officials' reliance on clearly established law, see *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982); and cases applying the *Teague* bar which, among other objectives, protects States that rely on the law existing at the time a conviction becomes final, see *Teague* v. *Lane*, 489 U. S. 288, 310 (1989). Cf. *ante*, at 758. As the Court seems to acknowledge, however, there may be other areas where the importance of the reliance interests that are disturbed precludes a remedy despite the retroactive application of the new rule. *Ante*, at 758–759. In my view, reliance on statutes of limitations falls into that category in certain circumstances, see *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, 371–374 (1991) (O'CONNOR, J., dissenting); *id.*, at 379 (KENNEDY, J., dissenting); *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 221–222 (1990) (STEVENS, J., dissenting); *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604 (1987); *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971), consistent with a long tradition of judicial authority to formulate rules ensuring fair and predictable enforcement of statutes of limitations, for

instance, through rules pertaining to tolling or waiver. See
*American Trucking Assns., Inc., supra,* at 221 (STEVENS, J.,
dissenting) (citing *Braun* v. *Sauerwein,* 10 Wall. 218, 223
(1870)). When a hard case presents the question of our au-
thority to deny relief in a retroactivity case, that will be soon
enough to resolve it; for the law in this area is, and ought to
be, shaped by the urgent necessities we confront when there
is a strong case to be made for limiting relief despite the
retroactive application of the law.

This is not a case where we need to address the issue
whether a party is entitled to a full remedy in a retroactivity
case, because that question arises only when the right is
predicated upon a new rule of law, see *United States* v. *John-
son,* 457 U. S. 537, 549 (1982), and *Bendix Autolite Corp.* v.
*Midwesco Enterprises, Inc.,* 486 U. S. 888 (1988), did not an-
nounce a new rule. In the civil context, a case announces a
new rule of law "either by overruling clear past precedent
on which litigants may have relied, . . . or by deciding an
issue of first impression whose resolution was not clearly
foreshadowed." *Chevron Oil, supra,* at 106; cf. *Teague* v.
*Lane, supra,* at 301 (new rule in criminal context is one not
"*dictated* by precedent existing at the time the defendant's
conviction became final"). Respondent could not and does
not attempt to argue that the *Bendix* decision overruled
clear past precedent. Rather, she asserts its holding was
not clearly foreshadowed. As the Court was explicit to ac-
knowledge in *Bendix,* however, it was "[a]pplying well-
settled constitutional principles," *Bendix, supra,* at 889, not
a new legal theory or one that had not been foreshadowed
by other precedents.

In *Brown-Forman Distillers Corp.* v. *New York State Liq-
uor Authority,* 476 U. S. 573, 578–579 (1986), the Court iden-
tified two modes of analysis to evaluate state statutes under
the Commerce Clause. The Court will consider the statute
invalid without further inquiry when it "directly regulates
or discriminates against interstate commerce, or when its

effect is to favor in-state economic interests over out-of-state interests," *id.*, at 579; and it will balance the State's interest against the burden on interstate commerce when the statute "has only indirect effects on interstate commerce and regulates evenhandedly," *ibid.* (citing *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970)). Respondent concedes that the *Pike* balancing test is well established but claims its application to the Ohio tolling provision in *Bendix* was not predictable.

Her argument fails on two fronts. First, in *Bendix* the Court observed the Ohio tolling provision was so blatant an affront to interstate commerce that it might be considered invalid without engaging in the balancing test. See 486 U. S., at 891; see also *id.*, at 898 (SCALIA, J., concurring). Second, the balancing test provides a clear and certain standard in cases such as *Bendix*, see *id.*, at 894–895; and even if it did not, the "application of precedent which directly controls is not the stuff of which new law is made," *Harper* v. *Virginia Dept. of Taxation*, 509 U. S. 86, 112 (1993) (KENNEDY, J., concurring in part and concurring in judgment); see *Wright* v. *West*, 505 U. S. 277, 309 (1992) (KENNEDY, J., concurring in judgment) ("Where the beginning point is a rule of . . . general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent"); see also *Keene Corp.* v. *United States*, 508 U. S. 200, 215 (1993) (case does not announce new rule where claims are resolved "under well-settled law"); *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 496 (1968) (case does not announce new rule unless it indicates "that the issue involved was novel, that innovative principles were necessary to resolve it, or that the issue had been settled in prior cases in a manner contrary to the view held by [the Court]").

As "a mere application of . . . existing precedent," *Harper, supra,* at 112 (KENNEDY, J., concurring in part and concur-

ring in judgment), *Bendix* did not "decide . . . 'an issue of first impression,'" *Ashland Oil, Inc.* v. *Caryl,* 497 U. S. 916, 920 (1990) *(per curiam)* (quoting *Chevron Oil, supra,* at 106), come "out of the blue," *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529, 556 (1991) (O'CONNOR, J., dissenting), or represent "an avulsive change which caused the current of the law thereafter to flow between new banks," *Hanover Shoe, supra,* at 499.

*Bendix* did not announce a new rule of law, so I would reverse on this ground, postponing extended discussion of reliance interests as they bear upon remedies for a case which requires us to address that issue.